Nicholas G. Sekas, Esq.
Giancarlo Ghione, Esq.
**SEKAS LAW GROUP, LLC**
530 Sylvan Avenue, Suite 201
Englewood Cliffs, New Jersey 07632
(201) 816-1333
*Attorneys for Plaintiff, Jonathan Gomez Noriega*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JONATHAN GOMEZ NORIEGA, | **CIVIL ACTION NO.** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| THE CITY OF JERSEY CITY; MAYOR STEVEN FULOP (individually and in his official capacity as Mayor of the City of Jersey City); KIMBERLY WALLACE-SCALCIONE (individually and in her official capacity as Press Secretary/Spokesperson for the City of Jersey City); JOHN MINELLA (individually and in his official capacity as Mayor Fulop's Chief of Staff); JOHN METRO (individually and in his official capacity as Jersey City Manager); MOBIN YOUSAF (individually and in her official capacity as Jersey City Director, Employee Relations & Workforce Management); JOHN DOE (1-10) | |
| Defendants. | |

Plaintiff, Jonathan Gomez Noriega, as and for his complaint against Defendants, the City of Jersey City, New Jersey; Steven Fulop (individually and in his official capacity as Mayor of the City of Jersey City); Kimberly Wallace-Scalcione (individually and in her official capacity as Press Secretary/Spokesperson for the City of Jersey City; John Minella (individually and in his official capacity as Mayor Fulop's Chief of Staff); and John Metro (individually and in his official capacity as Jersey City Manager) alleges as follows:

## PRELIMINARY STATEMENT

Since 2016, Jersey City Mayor Steven Fulop has been eyeing a run for New Jersey governor, relying on support from the progressive wing of the Democratic Party. Plaintiff Jonathan Gomez, a loyal aide and Colombian-born immigrant, had been a close friend and trusted employee to Fulop since 2018. However, their relationship soured as Fulop faced mounting pressure from Democrat party leaders. For nearly eight months prior to Gomez's termination, Fulop was aware that Gomez was supporting his sister, Valentina Gomez, an out of state Republican candidate, and even Mayor Fulop advised Gomez to focus on family. Despite this, Fulop ultimately chose to terminate Gomez's employment to bolster his progressive credentials.

This case arises from an abuse of public office, where Gomez's constitutionally protected political support for his sister led to his wrongful

2

termination. The evidence will show that Mayor Fulop, prioritizing his political image over fundamental rights, wrongfully terminated Gomez, disregarding his protected First Amendment activity. Gomez's termination was not based on job performance but on his familial and political association, showcasing Fulop's willingness to sacrifice an employee's career to maintain political favor. This lawsuit seeks redress for the significant harm inflicted on Gomez's life and career, affirming that political association and familial support remain protected under the Constitution, even for public employees.

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff, Jonathan Gomez Noriega is an individual residing in the State of New Jersey. Mr. Gomez was at all times relevant hereto an Aide to Mayor Steven Fulop and employee of the City of Jersey City.

2.     Defendant, City of Jersey City ("Jersey City"), is a body corporate and politic within the State of New Jersey with its principal place of business at 280 Grove Street, Jersey City, New Jersey 07302. The City is organized under the State of New Jersey's Faulkner Act. N.J.S.A 40:69A-1 to 40:69A-210.

3.     Defendant, Steven Fulop ("Mayor Fulop"), currently serves as the Mayor of Jersey City is sued individually and in his official capacity. Mayor Fulop is a resident of Jersey City and acts or otherwise does business at 280 Grove Street, Jersey City, New Jersey 07302. Mayor Fulop is an announced candidate seeking the

office of New Jersey Governor running in the June 2025 primary for the Democrat nomination.

4.      Defendant, Kimberly Wallace-Scalcione, currently serves as the press secretary/spokesperson for the City of Jersey City is sued individually and in her official capacity. Wallace-Scalcione is a resident of Jersey City and acts or otherwise does business at 280 Grove Street, Jersey City, New Jersey 07302.

5.      Defendant, John Minella, currently serves as the chief of staff to Jersey City Mayor Steven Fulop is sued individually and in his official capacity. Minella is a resident of Bayonne and acts or otherwise does business at 280 Grove Street, Jersey City, New Jersey 07302.

6.      Defendant, John Metro, currently serves as the Jersey City Manager and is sued individually and in his official capacity. Metro is a resident of Jersey City and acts or otherwise does business at 280 Grove Street, Jersey City, New Jersey 07302.

7.      Defendant, Mobin Yousaf, currently serves as the Jersey City Director of Employee Relations & Workforce Management and is sued individually and in her official capacity. Yousaf is a resident of Jersey City and acts or otherwise does business at 280 Grove Street, Jersey City, New Jersey 07302.

8.      Defendant(s), John Doe (1-10) are parties whose identities are currently unknown.

9.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 over all claims alleged in Count One and Count Two as they arise under the Constitution and Laws of the United States including 42 U.S.C. §1983.

10.     This Court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. § 1367 over all claims as they are so related to the claims within original jurisdiction that they form the same case or controversy under Article III of the Constitution.

11.     Venue is appropriate pursuant to 28 U.S.C. § 1391 (b)(1) and (2) as all defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTS COMMON TO ALL COUNTS

12.     Mr. Gomez is a Colombian born immigrant that migrated to the United States in 2009.

13.     Mr. Gomez is a member of a protected class as a Latino immigrant that became a United State citizen in 2016.

14.     Mr. Gomez competed in the 2016 Olympics held in Rio de Janeiro, Brazil competing on Colombia's national team.

15.     Mr. Gomez also competed in the 2019 Pan American Games swimming for Colombia's national team. Mr. Gomez won the Bronze Medal while competing in the Pan American Games.

16.    Mr. Gomez first met Mayor Fulop in 2016 at the Pershing Field pool while training for the 2016 Olympics. Mr. Gomez was a resident of Jersey City at the time he met Mayor Fulop.

17.    Mayor Fulop was swimming in the same pool Mr. Gomez was using to train for the Olympics.

18.    Mayor Fulop provided Mr. Gomez with his business card after meeting at the Pershing Field pool in 2016.

19.    Mr. Gomez later moved to Dallas, Texas to study economics and swim for the Southern Methodist University swimming team.

20.    Mr. Gomez returned to Jersey City upon graduating from Southern Methodist University in 2018 while training to compete in the 2020 Tokyo Olympics.

21.    Considering training for the Olympics to be intensive, Mr. Gomez was seeking part-time employment that would accommodate his commitment to training for the 2020 Olympics.

22.    In pursuit of part-time employment, Mr. Gomez reached out to Mayor Fulop. Mayor Fulop offered Mr. Gomez a part-time position from 2018-2019.

23.    In this part-time position, Mr. Gomez and Mayor Fulop worked closely on various initiatives while building a relationship and friendship.

24.    As a part-time employee, Mr. Gomez's responsibilities included, but were not limited to, addressing concerns raised by constituents, and representing Mayor Fulop at events that he chose not to attend.

25.    A NJ.Com article published on August 6, 2024 titled "Despite friendship, Fulop fires aide who donated to sister's anti-LGBTQ+ Campaign" quoted a "Hudson County insider" stating the events Mr. Gomez would attend were "non-controversial events" which were "[g]enerally more social community events as opposed to neighborhood issues, controversial issues and policy issues."[1]

26.    At no relevant time was Mr. Gomez a policy-making employee.

27.    In 2019, Mr. Gomez left Jersey City as a part-time employee to continue training as a professional swimmer at the University of Florida.

28.    Mr. Gomez and Mayor Fulop remained in contact while Mr. Gomez was in Florida and continued to build a close personal relationship with one another. Mayor Fulop congratulated Mr. Gomez via a text message after winning the Bronze medal at the 2019 Pan-American games in Lima, Peru.

29.    Mr. Gomez retired from professional swimming in 2021 and returned to Jersey City in 2022 where he accepted a full-time position in the Mayor's Office.

30.    Mr. Gomez's full-time position was as an Aide to Mayor Fulop.

---

[1]    https://www.nj.com/hudson/2024/08/despite-friendship-fulop-fires-aide-who-donated-to-sisters-anti-lgbtq-campaign.html (*last visited November 18, 2024*)

31.     As an aide to Mayor Fulop, Mr. Gomez was an employee of the City of Jersey City.

32.     Mr. Gomez and Mayor Fulop's relationship evolved from a working relationship to a close professional and personal connection.

33.     Mayor Fulop grew to trust Mr. Gomez so much that he would invite Mr. Gomez into his home to spend time at Fulop's residence in Jersey City with his children. Mayor Fulop's children took an interest in swimming, and Mr. Gomez began providing swimming lessons to the Fulop children as a courtesy to Mayor Fulop.

34.     In April 2013 Mayor Fulop created the Jersey City LGBTQ+ Task Force with the mission to promote & practice equality, respect & inclusiveness for LGBTQ+ employees, residents, businesses & organizations.

35.     Mayor Fulop, by virtue of his role as Mayor, was empowered to directly appoint one of the members of the LGBTQ+ task force.

36.     In 2022, Mayor Fulop appointed Mr. Gomez as a member of the Jersey City LGBTQ+ Task Force.

37.     When Mayor Fulop appointed Mr. Gomez to the task force, Jersey City employees began mocking him, as the position was seen as undesirable—one that none of Mayor Fulop's aides wanted. Mr. Gomez was assigned the role simply because he was the "new guy."

38.    Mayor Fulop did not need to appoint a City of Jersey City employee to this role. His appointment power would have allowed him to appoint any person to the task force.

39.    The task force was formally overseen by Mrs. Jeana F. Abuan, whom Mayor Fulop appointed as the Chief Task Force Administrative Officer.

40.    In private conversations Mayor Fulop, Chief of Staff John Minella and City Manager John Metro expressed ongoing concerns regarding Mrs. Abuan's competence in fulfilling her duties and ridiculed her involvement in the Task Force due to a rumor that she was personally opposed to LGBTQ+ individuals which beliefs directly contradicted the goals of the task force.

41.    At no time did Mayor Fulop or others demand Mrs. Abuan to resign from the LGBTQ+ Task Force.

42.    Despite Mayor Fulop touting this task force as a vehicle for inclusivity, the Task Force rarely held meetings for its stated purpose and was instead formed as a mode for Mayor Fulop to hold himself out as a progressive Democrat.

43.    In November 2023 Mr. Gomez's sister, Valentina Gomez, decided that she would run in the Republican primary to become the next Secretary of State for the State of Missouri.

44.    The 2024 primary election in Missouri was on August 6, 2024.

45.     Prior to the primary election, on November 3, 2023, Mr. Gomez advised Mayor Fulop via text message that Ms. Gomez would be running for political office as a Republican in Missouri. Mr. Gomez stated:

> Good afternoon Mayor, my sister is running to become the next secretary of state. I don't agree with her decision but as her older brother, I have to support her. Not her viewpoints or proposals but her strength. I'm sorry if this causes any problems.

46.     Recognizing Mr. Gomez has a first amendment right to support Ms. Gomez's campaign, Mayor Fulop replied later that day stating, "It does not cause any problems- how is her campaign go[ing]."

47.     Mayor Fulop was then advised that Ms. Gomez's first donation was from Mr. Gomez.

48.     Mr. Gomez exercised his constitutionally protected right to free speech by contributing to and supporting his sister's political campaign.

49.     Mayor Fulop was aware Ms. Gomez was running for political office as a Republican and seeking the support or endorsement of President Donald. J. Trump.

50.     Mr. Gomez, a registered Democrat, was opposed to his sister's political beliefs and rhetoric on the campaign trail, but in the spirit of love for family chose to engage in protected activity by financially supporting his sister's campaign.

51.     Mr. Gomez contributed $50 a month to his sister's campaign to be Missouri's next Secretary of State.

52.    Mayor Fulop continued to support and employ Mr. Gomez as an aide after learning that he was financially supporting Ms. Gomez's political campaign.

53.    Mr. Gomez's support of Ms. Gomez's campaign was not a problem to Mayor Fulop until Mr. Gomez's political support of Ms. Gomez was reported on by the media, as detailed below.

54.    During Mr. Gomez's employment, Mayor Fulop and other staff members frequently joked about Ms. Gomez's social media posts and her conservative views on current American issues. Defendants were fully aware, even prior to the early August news reports, of Ms. Gomez's political stances on these controversial issues and of Mr. Gomez's support for her political campaign.

55.    Mr. Gomez made it known to Mayor Fulop and Jersey City employees that he disagreed with his sister's political rhetoric but still chose to engage in protected activity by supporting his sister's campaign as a Republican because they are family.

56.    On April 9, 2024, Mayor Fulop announced he will be seeking the Democrat Party's nomination to be the next governor of the State of New Jersey.

57.    Mayor Fulop is holding himself out as a progressive leader of the Democrat Party and ally of the LGBTQ+ community to boost his chance of victory in the Democrat primary.

58.    Mayor Fulop was supportive of Mr. Gomez's protected first amendment activity, namely the support of Ms. Gomez's campaign, until pressure from media outlets and progressive groups began to mount relating to Mr. Gomez's political contributions to Ms. Gomez's campaign.

59.    In early August 2024, The Jersey City Times, an online news publication, began inquiring of Mayor Fulop and other Jersey City employees about Mr. Gomez's employment, membership of the LGBTQ+ task force, and political contributions to Ms. Gomez's campaign.

60.    Upon information and belief leaders in the New Jersey LGBTQ+ movement began inquiring directly to Mayor Fulop and/or his agents[2] regarding Mr. Gomez's connection to Mayor Fulop and his support of Ms. Gomez's campaign.

61.    Mayor Fulop began to grow concerned that his connection to Mr. Gomez would hurt his political ambitions of being New Jersey's next Democrat governor.

62.    On August 2, 2024, Mr. Gomez received a request from the Jersey City Times requesting comment regarding his support of Ms. Gomez's political campaign. In a written statement, Mr. Gomez stated:

> While I support all of my family members, including my sister Valentina, in their personal endeavors, we often have different views. My life story and trajectory reflect my

---

[2] Mayor Fulop's agents include and are not limited to his political campaign staff as well as employees employed by the City of Jersey City.

commitment to inclusivity, respect, and equality for all individuals. I do not share the views expressed in her statement.

63.    Mayor Fulop approved Mr. Gomez's statement.

64.    The Jersey City Times posted their story making it publicly known that Mr. Gomez, an aide to Mayor Fulop, was politically supporting Ms. Gomez's campaign as a conservative Republican because she is his sister. The story was published with the title, "Aide to Mayor Fulop Backs Sister's Hate-Filled Campaign in Missouri."[3]

65.    Upon the publication of this story, Mayor Fulop faced increased pressure, triggering him to act erratically toward and discriminate against Mr. Gomez for politically supporting Ms. Gomez.

66.    On August 2, 2024, Jersey City Times' X account posted a link to its article titled "Aide to Mayor Fulop Backs Sister's Hate-Filled Campaign in Missouri."[4] This post received over 41,000 views.

67.    Mr. Gomez traveled to Missouri on August 4, 2024, to spend time with his sister and family. This time away was pre-approved by the City of Jersey City as personal vacation time for Mr. Gomez.

---

[3]https://jcitytimes.com/aide-to-mayor-fulop-donates-to-sisters-hate-filled-campaign-in-missouri/ (*Last visited November 18, 2024*)

[4] https://x.com/JerseyCityTimes/status/1819521464493568237 (*Last visited November 18, 2024*)

68.    Mayor Fulop was aware Mr. Gomez would be out of the office on vacation from August 5, 2024, to August 6, 2024.

69.    Despite knowing Mr. Gomez was away, Mayor Fulop began his discriminatory tirade resulting from his anger that the media was inquiring about Mr. Gomez's support for Ms. Gomez's political campaign. Mayor Fulop continued to place immense pressure on Mr. Gomez to release statements against Ms. Gomez.

70.    On August 4, 2024 Councilman Frank Gilmore posted on X stating:

> Mayor @StevenFulop you must remove Johnathan from the LGBTQ task force. He can not contribute financially to a candidate who direct hate speech to the LGBTQ community and be expected to properly represent said community. [5]

71.    On August 5, 2024, while on vacation, Mayor Fulop texted Mr. Gomez in a group chat at or about 7:07 AM with Jersey City Manager John Metro and Mayor Fulop's Chief of Staff John Minella berating Mr. Gomez for supporting Ms. Gomez's campaign as a conservative Republican.

72.    Mayor Fulop advised Mr. Gomez that he needed to resign from the LGBTQ+ task force and that when Mr. Gomez was home from vacation they, "[w]ill discuss whether you [Mr. Gomez] can remain working in my [Mayor Fulop's] office. Your values in helping her [Ms. Gomez] are not consistent with our office or city…"

---

[5]    https://x.com/EducationalGil1/status/1820250602036670912    (*Last    visited November 18, 2024*)

73.    Mr. Gomez's support of his sister's campaign came through political contributions, a fact Mayor Fulop was aware of as early as November 2023. Mr. Gomez did not contribute to any campaign decisions, strategy, or messaging for Ms. Gomez's campaign in any meaningful way.

74.    Mr. Gomez advised Mayor Fulop that he does not have any control over Ms. Gomez's campaign messaging and that his support for Ms. Gomez has been limited.

75.    When discussing Mr. Gomez's financial support of Ms. Gomez, Mr. Gomez told Mayor Fulop, "[I] love my family; I only got one."

76.    On August 5, 2024, at approximately 9:51 AM, Mayor Fulop contacted Mr. Gomez once again, demanding that he issue an additional statement announcing his resignation from the LGBTQ+ task force while publicly condemning Ms. Gomez's statements as disgusting. Mayor Fulop further engaged in discriminatory conduct by warning Mr. Gomez that any public support or campaigning for Ms. Gomez would result in adverse consequences.

77.    Mayor Fulop advised Mr. Gomez that if any evidence exists showing Mr. Gomez supporting Ms. Gomez's campaign it will result in termination from the City in direct violation of Jersey City's non-discrimination policy found in the City of Jersey City Policies and Procedures.

78.     Despite being away on vacation, where it was the first time in over a year that Mr. Gomez was able to spend quality time with his parents and siblings, Mr. Gomez released the following statement on August 5, 2024, at the direction of Mayor Fulop:

> Different beliefs shouldn't divide us. This issue touches dinner tables across America. I choose respect, peace, and the chance to embrace my loved ones, putting family above politics and any appointed position.
>
> I do not and will never discriminate against ANY human being. I am an Olympic Swimmer, a Graduate of Columbia University School of International Public Affairs, and have been loyally serving the people of Jersey City for over six years.
>
> Let me be clear: I do not support any hateful remarks directed toward the LGBTQ+ community or any individual. I am formally stepping down from the Mayor's LGBTQ+ Task Force and look forward to continue serving the people of Jersey City, focusing on a future where meritocracy and results matter most.
>
> My life is a testimony of philanthropy, dedication, and excellence. I may not agree with everything my sister says, but I love her. It's this kind of boldness that makes our country strong.
>
> Political differences should not destroy families.

79.     On August 5, 2024 at or about 2:47 PM, moments after posting the above statement on X, Mayor Fulop called Mr. Gomez demanding he "fix" his tweet or be fired within the next 5 minutes.

80.    In hopes of not getting fired by Mayor Fulop, Mr. Gomez complied and

edited his tweet in hopes of ending Mayor Fulop's tirades directed towards Mr.

Gomez. The revised version stated:

> Different beliefs shouldn't divide us. This issue touches dinner tables across America. I choose respect, peace, and the chance to embrace my loved ones, putting family above politics and any appointed position.
>
> I do not and will never discriminate against ANY human being. I am an Olympic Swimmer, a Graduate of Columbia University School of International Public Affairs, and have been loyally serving the people of Jersey City for over six years.
>
> Let me be clear: I do not support any hateful remarks directed toward the LGBTQ+ community or any individual. I am formally stepping down from the Mayor's LGBTQ+ Task Force and look forward to continue serving the people of Jersey City, focusing on a future where meritocracy and results matter most.
>
> My life is a testimony of philanthropy, dedication, and excellence. I may not agree with everything my sister says, but I love her. It's this kind of boldness—**stepping up for my family and maintaining our relationship**—that makes our country strong.
>
> Political differences should not destroy families.
>
> [*emphasis added*]

81.    On August 5, 2024, at or about 2:52 PM, Mayor Fulop again called Mr.

Gomez, resulting in a 9-minute conversation during which Mayor Fulop shouted and

threatened Mr. Gomez with termination unless he complied with his demands to condemn Ms. Gomez.

82.     On August 5, 2024 at or about 4:02 PM Mayor Fulop called Mr. Gomez yet again. Mr. Gomez did not answer, thereby avoiding further discrimination and harassment from Mayor Fulop resulting from his protected political activity.

83.     On August 5, 2024, at or about 4:04 PM, just moments after the missed call referenced above, Mayor Fulop calls Mr. Gomez again. Mr. Gomez answered this call. Mayor Fulop proceeded to berate Mr. Gomez during this 8-minute phone call.

84.     On August 5, 2024, at or about 4:54 PM, Hudson County Democrat Committee Chairman and party boss, who also serves as Hudson County Executive, Craig Guy, released a statement calling for Mr. Gomez to be fired immediately.[6] Guy's post on X stated "Jonathan Gomez-Noriega should be fired, not just removed from the LGBTQ+ Task Force."

85.     Guy's predecessor as Hudson County Democrat Committee Chairman, Anthony Vainieri, Jr., announced in April 2024, that Mayor Fulop received Hudson County Democrat Committee's support for his gubernatorial bid.

---

[6]    https://x.com/HeinisHardNews/status/1820563975366643998    (*Last    visited November 18, 2024*)

86.    Guy became chairman of the Hudson County Democrats in June 2024 and announced in this same month that Fulop no longer had the Hudson County Democrat Committee's endorsement for governor. As such, Fulop has grown concerned that he will not have the Hudson County Democrat Committee's support in the 2025 gubernatorial primary.

87.    Support in Hudson County, Mayor Fulop's home county, would be a serious advantage to Mayor Fulop's gubernatorial campaign as Hudson County has over 220,000 registered Democrat voters, eclipsed only by Essex County which has over 300,000 registered Democrat voters. Hudson County contributed over 10% of the Democrat votes cast out of all 21 counties in the 2017 Democrat primary.

88.    Mayor Fulop felt continuing Mr. Gomez' employment would undermine his chances of securing support from both Hudson County and progressive Democrats statewide given Guy's public condemnation of Mr. Gomez.

89.    On August 5, 2024, Garden State Equality, an influential political action group advocating on behalf of the LGBTQ+ community and fierce supporters of New Jersey Democrats issued a letter to Mayor Fulop demanding Mayor Fulop remove Mr. Gomez from the LGBTQ+ task force and that Mr. Gomez issue a statement condemning Ms. Gomez's campaign and distance himself from Ms. Gomez.

90.    Garden State Equality is an organization whose support Mayor Fulop seeks to secure to bolster his gubernatorial campaign for the 2025 Democratic primary.

91.    On August 5, 2024, at or about 5:58 PM, Mayor Fulop again called Mr. Gomez. Mr. Gomez did not answer this phone call as he was spending time with family and wanted to avoid further harassment from Mayor Fulop.

92.    On August 5, 2024, at or about 6:51 PM, Mayor Fulop again calls Mr. Gomez. Mr. Gomez does not answer this phone call.

93.    On August 5, 2024, at or about 7:09 PM Mr. Gomez receives 2 missed calls from Jersey City Manager John Metro.

94.    On August 5, 2024, at or about 7:13 PM Mayor Fulop again calls Mr. Gomez. Mr. Gomez again does not answer this phone call.

95.    On August 5, 2024, at or about 7:17 PM and 7:22 PM Mr. Gomez received another two missed calls from Mayor Fulop's Chief of Staff John Minella.

96.    On August 5, 2024, at or about 8:57 PM, Ms. Gomez posted a video on X, highlighting Mayor Fulop's aggressive behavior toward Mr. Gomez. In the video, Ms. Gomez plays a portion of a phone call between Mayor Fulop and Mr. Gomez, during which Fulop demands that Mr. Gomez make a stronger public statement or face termination by the mayor.

97.    In the audio captured and published by Ms. Gomez, Mayor Fulop is heard referencing Mr. Gomez's statement. Mayor Fulop told Mr. Gomez on the phone, "If you think that [Gomez's statement] is boldness I am going to fire you. I am gonna look in five minutes, if it is not clear where you stand then you are not with me, you're with her and you can't work with me, period. Okay, like that's it."

98.    Mayor Fulop replied to Ms. Gomez and fired Mr. Gomez via social media post on X stating:

> Ms. Gomez - first your brother WAS an "at-will" employee for the city - as of tomorrow he no longer works there bc he doesn't reflect the values of the city. Second, You can see how strongly I feel about the LGBTQ community and I'll share the text messages we exchanged so ppl know ill fight for them when people are watching and the same when they can't see what I'm doing.[7]

99.    Defendant Yousaf, in a letter dated August 12, 2024, sent via regular and certified mail, notified Mr. Gomez of the termination of his employment with the City of Jersey City, effective retroactively to August 6, 2024.

100.    The Jersey City Policies and Procedures, "[p]rohibits any form of discrimination, including unlawful and prohibited harassment based upon…. natural origin, ancestry… political activities or political affiliations…"

---

[7] https://x.com/StevenFulop/status/1820630575100682410 (*Last visited November 20, 2024*)

101.   The Jersey City Policies and Procedures refers to a person engaging in political activity or political affiliations as a "Protected Characteristic."

102.   Mr. Gomez's national origin as a Colombian-American immigrant is also a protected characteristic.

103.   This policy goes on to state that it is Jersey City policy, "[t]hat all employees are responsible for assuring that the workplace is free from harassment based upon any Protected Characteristic."

104.   Mayor Fulop wrongfully terminated Mr. Gomez for Mr. Gomez's political support of Ms. Gomez's political campaign in violation of Mr. Gomez's right to political association.

105.   Jersey City is a diverse community made up of residents, like Mr. Gomez, who traveled to the United States from foreign countries.

106.   Despite being a diverse community, Mr. Gomez was subject to a hostile work environment by Mayor Fulop's chief of staff, John Minella and Jersey City Manager John Metro.

107.   Throughout the course of Ms. Gomez's campaign, Minella would play campaign videos of Ms. Gomez for the office to view while Metro would laugh at the video's contents.

108.   While playing the videos, Minella would ask, "Is this how all Colombians behave?" Minella would also question if all Colombians were loud.

109.   Minella frequently commented on Mr. Gomez's lunch, which occasionally consisted of rice and beans, and often made culturally insensitive remarks about his food choices. The comments were made to embarrass Mr. Gomez in front of other Jersey City employees and whenever Mr. Gomez would bring rice and beans for lunch.

110.   Mayor Fulop held a press conference after terminating Mr. Gomez where he falsely stated Mr. Gomez would no longer be able to represent the interests of the diverse Jersey City community despite being a Colombian-American immigrant who knows firsthand the struggles immigrants face when integrating into America's society.[8]

111.   On August 6, 2024, the online news publication, Hudson County View, released an article titled, "Gomez controversy ends with Fulop firing aide after sister says he'll file 'huge lawsuit'"[9] which contained quotes from defendant Wallace-Scalcione. Defendant Wallace-Scalcione stated:

> **The Fulop Administration has zero tolerance for bigotry and racism**, and Mayor Fulop's record speaks to that. There isn't a mayor in New Jersey with a track record of supporting the LGBTQ+ community. The mayor showed yesterday that he defends the community with passion in public and private, and he is the same fierce defender when he doesn't expect the public to see it. With

---

[8] https://www.youtube.com/watch?app=desktop&v=m3cLFWoVZMw (*Last visited November 18, 2024*)

[9]   https://hudsoncountyview.com/gomez-controversy-ends-with-fulop-firing-aide-after-sister-says-hell-file-huge-lawsuit/ (*Last visited November 18, 2024*)

regard to Jonathan, the mayor has a longstanding personal relationship with Jonathan as a mentor for years. So, it saddens the mayor not only because he feels violated and betrayed by Jonathan's decision to record and weaponize personal conversations but more that **Jonathan was unable to see the impact of not calling out hate** for what it is. Jonathan's actions are inexcusable. Whether it's campaigning for his sister, advising her hate-driven campaign, or supporting her financially, the fact is that Jonathan's actions render his responsibilities working in City Hall on policies around diversity impossible to achieve.

[*Emphasis added*]

112.    Defendant Wallace-Scalcione's comments painted Mr. Gomez as a bigot and racist.

113.    Wallace-Scalcione's comments were published in news articles and disseminated online which improperly assert Mr. Gomez as a racist and bigot preventing Mr. Gomez from securing further employment.

114.    On August 7, 2024 Hudson County View published another article titled, "While 'bittersweet', Fulop says he's 'certain' firing Gomez Noriega was the right call." This article states Mayor Fulop told the reporter that plaintiff "[j]oined his sister on the campaign trail yesterday…"

115.    Mr. Gomez's protected political activity supporting Ms. Gomez was a substantial or motivating factor in Fulop's decision to terminate Mr. Gomez.

116.    Mr. Gomez has applied to dozens of jobs, and despite being an Olympian with a bachelor's degree from Southern Methodist University and a

master's degree from Columbia University's School of International and Public Affairs, he is unable to secure employment due to defendants' defamatory public statements and retaliation.

## COUNT ONE
### RETALIATION UNDER COLOR OF LAW ON ACCOUNT OF CONSTITUTIONALLY PROTECTED SPEECH OF EXPRESSION
**(Mayor Steven Fulop, Mobin Yousaf, John Doe (1-10))**
**(42 U.S.C. § 1983)**

117.   Plaintiff repeats and realleges every allegation set forth above as if set forth in this count.

118.   42 U.S.C. § 1983 provides, among other things, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."

119.   Plaintiff's support for his sister, Ms. Gomez, in her campaign as a conservative candidate for the Republican nomination for Missouri Secretary of State, was entirely unrelated to his duties as an Aide to Mayor Fulop and was instead an exercise of his Constitutional right.

120.   Plaintiff's speech interest and first amendment right to support a Republican candidate outweighs the government's interest.

121.   Plaintiff suffered an adverse employment action through the actions of Mayor Fulop and defendant Yousaf.

122.   Plaintiff's speech, expression, and/or association was a substantial motivating factor in the adverse employment action.

123.   Defendant's actions were taken to retaliate against plaintiff for his expression of opinions as a private citizen. The retaliatory acts by defendants were proximately caused by plaintiff's constitutionally protected acts.

124.   The retaliatory actions of defendants were sufficient to deter a person of ordinary firmness from exercising their constitutional rights.

125.   Defendants' actions caused or subjected plaintiff to a deprivation of his rights, privileges, or immunities secured by the Constitution including, but not limited to, his right to speak or express his political views and opinions, and/or associate with others based on those political views.

126.   Defendants' actions were taken under color of a statute, ordinance, regulation, custom, or usage, of the State of New Jersey and/or the City of Jersey City.

127.   To the extent Mayor Fulop and Yousaf are sued in their official capacity, they are not entitled to legislative immunity because those claims are in all respects other than name, to be treated as a suit against the entity. The City, as a governmental entity is not entitled to any immunity whatsoever.

128.   To the extent Mayor Fulop and Yousaf are sued in their individual capacity, legislative immunity does not apply to them because their act was not substantively legislative. An act is substantively legislative where it involves "policy-making of a general purpose" or "line-drawing." Employment actions taken with respect to specific employees do not constitute substantively legislative conduct. Likewise, an official's executive or administrative actions are separable from actions taken in a legislative capacity.

129.   As a direct and proximate result of Mayor Fulop's and Yousaf's unreasonable and unlawful actions, plaintiff has suffered and continues to suffer substantial past and future damages, both compensatory and general, including, but not limited to, medical bills, loss of income, severe emotional distress, mental anguish, embarrassment, humiliation, and physical pain and suffering.

130.   Plaintiff has been damaged thereby.

**WHEREFORE**, plaintiff demands judgment against Mayor Steven Fulop for:

a) Compensatory damages;

b) Nominal damages;

c) Punitive damages;

d) Interest;

e) Costs of suit;

f)  Attorneys' fees; and

g)  Such other relief as the Court deems equitable and just.

### COUNT TWO
### MUNICIPAL ACTION TAKEN TO VIOLATE CIVIL RIGHTS – *MONELL V. DEPARTMENT OF SOCIAL SERVICES*, 436 U.S. 658 (1978); *BD. OF THE CTY. COMM'RS V. BROWN, 520 U.S. 397 (1997)* (CITY OF JERSEY CITY)

131.   Plaintiff repeats and realleges every allegation set forth above as if set forth in this count.

132.   The termination of Mr. Gomez by the City of Jersey City was an act of the municipality constituting official policy of the government itself.

133.   Municipal liability can attach under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for even a single decision made by a final policymaker regardless of whether or not the action is taken once or repeatedly.

134.   Municipal liability can attach under *Bd. Of The Cty. Comm'rs v. Brown*, 520 U.S. 397 (1997) when a decisionmaker has intentionally deprived a plaintiff of a federally protected right. Liability arises when action taken or directed by the municipality or decisionmaker violated federal law, establishing the municipal action was the moving force behind plaintiff's injury.

135.   The termination of Mr. Gomez was intended to retaliate against plaintiff for his exercise of his rights of speech and association under the First Amendment.

136.  As a direct and proximate result of defendants' unreasonable and unlawful actions, plaintiff has suffered and continues to suffer substantial past and future damages, both compensatory and general, including but not limited to, loss of income, loss of retirement, medical and other benefits, medical bills, severe emotional distress, mental anguish, embarrassment, humiliation, and physical pain and suffering.

137.  Pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the City of Jersey City is liable for the harms and losses sustained by plaintiff.

**WHEREFORE**, plaintiff demands judgment against City of Jersey City for:

a)  Compensatory damages;

b)  Nominal damages;

c)  Punitive damages;

d)  Interest;

e)  Costs of suit;

f)  Attorneys' fees; and

g)  Such other relief as the Court deems equitable and just.

## <u>COUNT THREE</u>
## NEW JERSEY LAW AGAINST DISCRIMINATION, N.J.S.A. 10:5-1 TO -49
## (City of Jersey City)

138.   Plaintiff repeats and realleges every allegation set forth above as if set forth in this count.

139.   The New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-1 to -49, ("NJLAD") prohibits discrimination because of, among other things, "race,… color, national origin, [or] ancestry." *N.J.S.A.* 10:5-3.

140.   Plaintiff is a Colombian born immigrant.

141.   The City of Jersey City terminated plaintiff because of his race, color, national origin, and/or ancestry.

142.   The City of Jersey City discriminated against plaintiff because of his race, color, national origin, and/or ancestry.

143.   As a direct and proximate result of defendants' unreasonable and unlawful actions, plaintiff has suffered and continues to suffer substantial past and future damages, both compensatory and general, including, but not limited to, loss of income, loss of retirement, medical and other benefits, medical bills, severe emotional distress, mental anguish, embarrassment, humiliation, and physical pain and suffering.

144.   Plaintiff was damaged thereby.

**WHEREFORE**, plaintiff demands judgment against City of Jersey City for:

a) Compensatory damages;

b) Nominal damages;

c) Punitive damages;

d) Interest;

e) Costs of suit;

f) Attorneys' fees; and

g) Such other relief as the Court deems equitable and just.

## COUNT FOUR
## AIDING AND ABETTING NEW JERSEY LAW AGAINST DISCRIMINATION, *N.J.S.A.* 10:5-1 TO -49
## (Mayor Steven Fulop, John Minella, John Metro, John Doe (1-10))

145.   Plaintiff repeats and realleges every allegation set forth above as if set forth in this count.

146.   Mayor Fulop actively participated in the unlawful discrimination against plaintiff because of his race, color, national origin, and/or ancestry.

147.   Mayor Fulop aided and abetted the City of Jersey City in violating NJLAD.

148.   Mayor Fulop created, promoted, and fostered discriminatory, and abusive atmosphere and participated in, allowed, promoted, aided and abetted actions against plaintiff that constitute harassment, abuse, hostile work environment, and discrimination based on protected traits.

149.   NJLAD prohibits conduct which aids or abets discrimination and harassment.

150.   At all relevant times, Mayor Fulop was the decision maker regarding the City's operations and failed to take prompt, appropriate, and/or remedial measures to prevent, stop, and remedy the harassment, abuse, hostile work environment and discrimination aimed at plaintiff.

151.   At all relevant times hereto, Mayor Fulop, John Metro and John Minella knowingly and substantially assisted in violation of NJLAD.

152.   At all times relevant hereto, Mayor Fulop was aware of his role in the overall illegal and unlawful activity directed at plaintiff at the times that activity occurred.

153.   At all times relevant hereto, John Minella and John Metro were aware of their role in the overall illegal and unlawful activity directed at plaintiff at times that activity occurred.

154.   As a result of the conduct set forth herein, Mayor Fulop, John Metro and John Minella are subject to individual liability pursuant to NJLAD.

155.   As a direct and proximate result of defendants' unreasonable and unlawful actions, plaintiff has suffered and continues to suffer substantial past and future damages, both compensatory and general, including, but not limited to, loss of income, loss of retirement, medical and other benefits, medical bills, severe

emotional distress, mental anguish, embarrassment, humiliation, and physical pain and suffering.

156.   Plaintiff was damaged thereby.

**WHEREFORE**, plaintiff demands judgment against Mayor Steven Fulop for:

a)  Compensatory damages;

b)  Nominal damages;

c)  Punitive damages;

d)  Interest;

e)  Costs of suit;

f)  Attorneys' fees; and

g)  Such other relief as the Court deems equitable and just.

## <u>COUNT FIVE</u>
## DEFAMATION/SLANDER
### (Kimberly Wallace-Scalcione, John Doe (1-10))

157.    Plaintiff repeats and realleges every allegation set forth above as if set forth in this count.

158.    There is no basis in fact for defendants' malicious and false statements asserting Mr. Gomez as supportive of comments made by Ms. Gomez's, referring to Mr. Gomez as a bigot and racist.

159.    There was never any basis in fact for this assertion.

160.    The statements made by defendants concerning Mr. Gomez were malicious, reckless, and/or recklessly made, and had the purpose and effect of damaging and injuring Mr. Gomez's good name and reputation in the eyes of the public and prospective employers.

161.    The statements made by defendant were broadcast to the media and thereby printed for public consumption to thousands of people across the country.

162.    The statements made by defendants concerning Mr. Gomez were not justified nor were they privileged communications.

163.    Prior to these communications by defendants, Mr. Gomez made defendants aware that his support was limited and that he disagreed with Ms. Gomez's statements regarding the LGBTQ+ community.

164.   Mr. Gomez's reputation has been irreparably harmed by the defamatory statements made by defendants.

165.   Mr. Gomez suffered damages and is entitled to compensatory and punitive damages from Defendant as a result of the malicious and reckless false statements and accusations made.

**WHEREFORE**, plaintiff demands judgment against Kimberly Wallace-Scalcione for:

    a) Compensatory damages;

    b) Nominal damages;

    c) Punitive damages;

    d) Interest;

    e) Costs of suit;

    f) Attorneys' fees; and

    g) Such other relief as the Court deems equitable and just.

## COUNT SIX
## FALSE LIGHT
### (Kimberly Wallace-Scalcione, John Doe (1-10))

166.   Plaintiff repeats and realleges every allegation set forth above as if set forth in this count.

167.   Defendant gave publicity to a matter concerning Mr. Gomez that defendant knew was false.

168.   Defendant either knew that the publicized material was false and would place plaintiff in a false light or acted with reckless disregard as to whether the publicized defamatory statements were false and the false impression created by the publicized defamatory statements.

169.   The defamatory statements made by defendants misrepresented Mr. Gomez's character, history, activities, or beliefs that a reasonable person in plaintiff's position would find the material highly offensive.

170.   The publicity caused by defendants' defamatory statements was the cause of injuries, damages and/or losses sustained by Mr. Gomez.

**WHEREFORE**, plaintiff demands judgment against Kimberly Wallace-Scalcione for:

a)  Compensatory damages;

b)  Nominal damages;

c)  Punitive damages;

d) Interest;

e) Costs of suit;

f) Attorneys' fees; and

g) Such other relief as the Court deems equitable and just.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues triable.

/s/Giancarlo Ghione
Giancarlo Ghione
Nicholas Sekas
Sekas Law Group, LLC
530 Sylvan Ave, Suite 201
Englewood Cliffs, NJ 07632

Dated: November 20, 2024