UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JONATHAN GOMEZ NORIEGA,<br><br>   Plaintiff,<br><br>  v.<br><br>THE CITY OF JERSEY CITY; MAYOR STEVEN FULOP (individually and in his official capacity as Mayor of the City of Jersey City); KIMBERLY WALLACE-SCALCIONE (individually and in her official capacity as Press Secretary/Spokesperson for the City of Jersey City); JOHN MINELLA (individually and in his official capacity as Mayor Fulop's Chief of Staff); JOHN METRO (individually and in his official capacity as Jersey City Manager); MOBIN YOUSAF (individually and in her official capacity as Jersey City Director, Employee Relations & Workforce Management); JOHN DOE (1-10)<br><br>   Defendants. | No. 2:24-cv-10599-WJM-JRA<br><br>OPINION RE MOTION TO DISMISS |

**WILLIAM J. MARTINI, U.S.D.J.**

On November 20, 2024, Plaintiff Jonathan Gomez Noriega filed a six-count complaint against the City of Jersey City, New Jersey, its mayor, and four of its employees alleging (1) retaliation under color of law for constitutionally protected speech, expression and/or association as prohibited by the First Amendment to the Constitution of the United States and 42 U.S.C. § 1982 by Defendants Fulop and Yousaf; (2) municipal liability for the violation of Plaintiff's civil rights in violation of 42 U.S.C. § 1983 as set forth in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) by the City of Jersey City; (3) discrimination because of race, color, national origin, and/or ancestry in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.* ("NJLAD") by the City of Jersey City; (4) aiding and abetting discrimination under the NJLAD by Defendants Fulop, Minella, and Metro;  (5) defamation and/or slander by Defendant Wallace-Scalcione; and (6) false light by Defendant Wallace-Scalcione. For each claim, Plaintiff seeks nominal, compensatory, and punitive damages, plus costs, fees, and interest.

Before the Court is Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 14.  For the reasons set forth herein, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.     FACTUAL BACKGROUND[1]

Plaintiff was born in Colombia and migrated to the United States in 2009. He first worked for Defendant Fulop, the Democratic mayor of the City of Jersey City, New Jersey, on a part-time basis in 2018 and 2019, at which time his responsibilities included "addressing concerns raised by constituents, and representing Defendant Fulop at events that he chose not to attend," though these events are alleged to have been "non-controversial events which were generally more social community events as opposed to neighborhood issues, controversial issues and policy issues." Compl. ¶¶ 24-25 (citation omitted). Plaintiff ended his part-time employment with Jersey City in 2019.

In 2022, Plaintiff was rehired as a full-time aide to Defendant Fulop. In this role, Plaintiff was an employee of the City of Jersey City. Defendant Fulop also appointed Plaintiff to the Jersey City LGBTQ+ Task Force. According to the Complaint, Plaintiff's membership on the LGBTQ+ task force was distinct from his employment with the Mayor's office. Compl. ¶¶ 34-38.

In November 2023, Plaintiff's sister Valentina Gomez began a campaign to become the Secretary of State for the State of Missouri, running as a conservative Republican with controversial beliefs on a range of issues and a penchant for provocative rhetoric particularly with respect to the LGBTQ+ community. *See, e.g.*, Compl. ¶ 64 n.3 (referring to Aaron Morrill, *Aide to Mayor Fulop Backs Sister's Hate-Filled Campaign in Missouri*, Jersey City Times (Aug. 2, 2024), https://jcitytimes.com/aide-to-mayor-fulop-donates-to-sisters-hate-filled-campaign-in-missouri/). Plaintiff informed Defendant Fulop of his sister's candidacy on November 3, 2023, at which time Defendant Fulop replied that her campaign did "not cause any problems." Compl. ¶¶ 45-46. Defendant Fulop was also informed that Plaintiff donated to his sister's campaign. Plaintiff donated $50 to his sister's campaign each month. Plaintiff alleges that he was "a registered Democrat, [and] was opposed to his sister's political beliefs and rhetoric on the campaign trail, but in the spirit of love for family" decided to contribute to her campaign anyway. Compl. ¶ 50.

Plaintiff's coworkers allegedly played Ms. Gomez's campaign videos and openly laughed at them. Plaintiff claims that he was subjected to inappropriate comments concerning his ethnicity and/or national origin. Specifically, he alleges that: (1) While playing Ms. Gomez's campaign videos, Defendant Minella asked "Is this how all Colombians behave?" and asked whether all Colombians "were loud," Compl. ¶ 108; and (2) Defendant Minella "made culturally insensitive remarks about his food choices" which "occasionally consisted of rice and beans." Compl. ¶ 109.

On April 9, 2024, Defendant Fulop announced that he would run for the Democratic nomination to be the next Governor of New Jersey. Plaintiff alleges that Defendant Fulop holds himself out as a "progressive leader of the Democrat Party and ally of the LGBTQ+ community." Compl. ¶ 57.

---

[1] "In considering a Rule 12(b)(6) motion, courts must 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)). The court may rely only on the facts alleged in the complaint and "exhibits attached to the complaint and matters of public record." *Id.* (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). Unless otherwise noted, the facts set forth herein are taken from Plaintiff's complaint, and are accepted as true only for the purpose of resolving the instant Motion.

In August 2024, Gomez received a request for comment from the Jersey City Times concerning his support for his sister's campaign. In a written statement approved by Mayor Fulop, Gomez stated: "While I support all of my family members, including my sister Valentina, in their personal endeavors, we often have different views. My life story and trajectory reflect my commitment to inclusivity, respect, and equality for all individuals. I do not share the views expressed in her statement." The Jersey City Times article was published on August 2, 2024 and updated on August 4, 2024.[2]

The Jersey City Times posted the article on the social media site X (f/k/a Twitter) on August 4, 2024. The same day, Jersey City Councilman Frank Gilmore also posted on the site, sharing: "Mayor @StevenFulop you must remove Johnathan from the LGBTQ task force. He can not contribute financially to a candidate who direct hate speech to the LGBTQ community and be expected to properly represent said community." Compl. ¶ 70. The following day, Defendant Fulop sent a message to a group chat including Plaintiff and Defendants Metro and Minella in which Defendant Fulop allegedly "berat[ed] [Plaintiff] for supporting Ms. Gomez's campaign as a conservative Republican," told him that "he needed to resign from the LGBTQ+ task force," and indicated that after Plaintiff returned from a previously planned vacation they would "discuss whether [Plaintiff could] remain working in [Defendant Fulop's] office" where Plaintiff's "values in helping [Ms. Gomez's campaign] are not consistent with our office or city." Compl. ¶¶ 71-72. Defendant Fulop also allegedly told Plaintiff that any evidence of Plaintiff's support for Ms. Gomez's campaign would result in Plaintiff's termination.

At Defendant Fulop's direction, Plaintiff released the following statement on August 5, 2024:

> Different beliefs shouldn't divide us. This issue touches dinner tables across America. I choose respect, peace, and the chance to embrace my loved ones, putting family above politics and any appointed position.
>
> I do not and will never discriminate against ANY human being. I am an Olympic Swimmer, a Graduate of Columbia University School of International Public Affairs, and have been loyally serving the people of Jersey City for over six years.
>
> Let me be clear: I do not support any hateful remarks directed toward the LGBTQ+ community or any individual. I am formally stepping down from the Mayor's LGBTQ+ Task Force and look forward to continue serving the people of Jersey City, focusing on a future where meritocracy and results matter most.

---

[2] The Jersey City Times article is a matter of public record and is incorporated by reference into the Complaint, *see* Compl. ¶ 64 n.3.

> My life is a testimony of philanthropy, dedication, and excellence. I may not agree with everything my sister says, but I love her. It's this kind of boldness that makes our country strong.
>
> Political differences should not destroy families.

Compl. ¶ 79. After Plaintiff posted this statement on X, Defendant Fulop called him and instructed him that he needed to promptly revise his statement or else he would be fired. Plaintiff added one clause to his statement: "It's this kind of boldness—**stepping up for my family and maintaining our relationship**—that makes our country strong." Compl. ¶ 80 (emphasis added). Defendant Fulop called Plaintiff again, threatening to fire Plaintiff if he failed to expressly condemn Ms. Gomez. Defendant Fulop called two more times about an hour later; Plaintiff answered the second call, and Defendant Fulop allegedly resumed "berat[ing]" Plaintiff over the course of the call.

Soon thereafter—still on August 5, 2024—Craig Guy, the chairman of the Hudson County Democratic Committee, who also serves as the Hudson County Executive, posted on X that "Jonathan Gomez-Noriega should be fired, not just removed from the LGBTQ+ Task Force." Compl. ¶ 84. According to Plaintiff, Defendant Fulop had previously won the Hudson County Democratic Committee's support for his gubernatorial bid under the leadership of Guy's predecessor, but Guy had withdrawn the Committee's endorsement when he assumed the chairmanship in June 2024. The same day, Garden State Equality—an "influential political action group advocating on behalf of the LGBQ+ community and fierce supporters of New Jersey Democrats"—wrote a letter to Defendant Fulop calling for Plaintiff's removal.

Between 5:58 PM and 7:13 PM on August 5, 2024, Plaintiff received (but did not answer) three calls from Defendant Fulop, two from Defendant Metro, and two calls from Defendant Minella.

At approximately 8:57 PM, Plaintiff's sister posted a video on X that included a portion of one of the phone calls between Plaintiff and Defendant Fulop.[3] In that recording, Defendant Fulop is heard telling Plaintiff, "If you think that [...] is boldness I am going to fire you. I am gonna look in five minutes, if it is not clear where you stand then you are not with me, you're with her and you can't work with me, period. Okay? Like, that's it." Compl. ¶ 97.

Defendant Fulop fired Plaintiff and stated as much in a post on X:

> Ms. Gomez – first your brother WAS an "at-will" employee for the city – as of tomorrow he no longer works there [because] he doesn't reflect the values of the city. Second, You can see how strongly I feel about the LGBTQ community and I'll share the text messages

---

[3] Plaintiff's Complaint does not indicate who recorded this call, but argues in Opposition to Defendant's Motion that the call was recorded by Ms. Gomez and that Plaintiff was unaware of the recording at the time. Because (a) the Court draws all reasonable inferences in Plaintiff's favor at this stage, (b) the allegations in the Complaint are not inconsistent with the inference that Ms. Gomez recorded the call—and, in fact, Ms. Gomez was the individual that posted the recording, and (c) the resolution of any issues concerning the admissibility of the recording would be premature at this stage, the Court assumes for the purpose of this Motion that Ms. Gomez, and not Plaintiff, recorded the call.

> we exchanged so [people] know [I'll] fight for them when people are watching and the same when they can't see what I'm doing.

Compl. ¶ 98. Plaintiff's termination was transmitted by Defendant Yousaf via regular and certified mail dated August 12, 2024 and stating that the termination was effective retroactively to August 6, 2024.

On August 6, the Hudson County View released an article which was titled "Gomez controversy ends with Fulop firing aide after sister says he'll file 'huge lawsuit'" and included the following statement from Defendant Wallace-Scalcione:

> The Fulop Administration has zero tolerance for bigotry and racism, and Mayor Fulop's record speaks to that. There isn't a mayor in New Jersey with a track record of supporting the LGBTQ+ Community. The mayor showed yesterday that he defends the community with passion in public and private, and he is the same fierce defender when he doesn't expect the public to see it.
>
> With regard to Jonathan, the mayor has a longstanding personal relationship with Jonathan as a mentor for years. So, it saddens the mayor not only because he feels violated and betrayed by Jonathan's decision to record and weaponize personal conversations but more that Jonathan was unable to see the impact of not calling out hate for what it is. Jonathan's actions are inexcusable. Whether it's campaigning for his sister, advising her hate-driven campaign, or supporting her financially, the fact is that Jonathan's actions render his responsibilities working in City Hall on policies around diversity impossible to achieve.

Plaintiff alleges that as a result of the Defendants' public statements, he has been unable to secure employment since his termination from the City of Jersey City.

Plaintiff filed his six-count Complaint on November 20, 2024. Defendants filed their motion to dismiss on January 31, 2025.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). This assumption of truth is inapplicable, however, to legal conclusions couched as factual allegations or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556

U.S. 662 (2009). That is, although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, *see id.* at 570, such that the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## III. DISCUSSION

### A. § 1983 and the First Amendment (Counts One and Two)

Plaintiff's First Amendment argument implicates both the right to freedom of association and the right to freedom of speech and expression. *See* Compl. ¶ 122 ("Plaintiff's speech, expression, and/or association was a substantial or motivating factor in the adverse employment action."). Accordingly, Defendants argue that Plaintiff's complaint fails to state a claim under either the applicable standards for either type of claim. Defendants further argue that even if Plaintiff's First Amendment rights were violated, the rights at issue were not clearly established at the time the violations took place, entitling the individual defendants to qualified immunity. The Court addresses each argument in turn.

#### 1. *Retaliation for Exercise of Right to Freedom of Association*

To make out a *prima facie* case of political affiliation discrimination by a public employer, a plaintiff "must show that (1) [he] was employed at a public agency that does not require political affiliation, (2) [he] was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007). At this stage, Defendants contest only the first element: whether Plaintiff has shown that he was employed at a public agency that does not require political affiliation.

Plaintiff alleges that he was an aide to the mayor, making him an employee of the City of Jersey City. Compl. ¶¶ 29-31. Defendants argue that the allegations contained in Plaintiff's complaint demonstrate that Plaintiff's role as an aide to the mayor falls within the *Elrod-Branti* exception to the general prohibition against employment discrimination for political affiliation because it is a policymaking position.[4] In other words, they argue that as an aide to the mayor, Plaintiff held the type of position for which consideration of an employee's political affiliation is

---

[4] In their Reply brief, Defendants insist that a majority of the justices in *Elrod* would have applied the exception to employees in policymaking *or confidential* roles. Reply at 3. And indeed, in *Boyle v. County of Allegheny*, the Third Circuit uses the "policymaking or confidential" position language repeatedly. The Court needs not decide whether the "confidential" label should be incorporated into the *Elrod-Branti* test because at *Boyle*'s core is its continued recognition that the applicability of the *Elrod-Branti* exception does not depend on the categorization of a position as "policymaking" or "confidential," but on "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 139 F.3d 386, 396 (3d Cir. 1998). As discussed herein, the Court applies this standard here.

an "appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980).

In *Minor v. Delaware River and Bay Authority*, the Third Circuit summarized the *Elrod-Branti* analysis as follows:

> [A]dverse employment actions against government employees that are based on political affiliation are, as a general rule, prohibited. But a narrow and important exception—the *Elrod-Branti* exception—exists for particular positions for which political affiliation is found to be an appropriate requirement. The notion of what constitutes a position for which political affiliation may acceptably be required has developed over time. Initially, in *Elrod v. Burns* the Supreme Court adopted an approach that distinguished between policymaking and non-policymaking positions. Following suit, we held that policymaker status itself—not the factors it comprises—presented a question of fact.
>
> However, the Supreme Court soon grew dissatisfied with *Elrod*'s categorical approach and shifted focus to whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved. Again following suit, we reaffirmed that whether an employee falls within the *Elrod/Branti* exception is generally one of fact. Yet we clarified that the ultimate inquiry is not whether the label 'policymaker' fits a particular position, but rather whether an employee (1) has duties that are non-discretionary or non-technical, (2) participates in discussions or other meetings, (3) prepares budgets, (4) possesses the authority to hire and fire other employees, (5) has a high salary, (6) retains power over others, and (7) can speak in the name of policymakers. Most important to this holistic analysis, we explained, is whether an employee has meaningful input into decisionmaking concerning the nature and scope of a major program. A person who holds an administrative role but lacks authority to give such input will not suffice.

70 F.4th 168, 175 (3d Cir. 2023) (cleaned up).

Defendants' first argument is that Plaintiff fell within the *Elrod-Branti* exception because, under the relevant provisions of New Jersey state law and the Jersey City Code establishing his position, he served as an at-will employee at the pleasure of the mayor and therefore "could be dismissed from his position for political reasons without violating the First Amendment." Mot. at 11. But neither N.S.J.A. § 40:69A-60.1 nor the relevant provision of the Jersey City Code includes any provision suggesting that public employers can terminate employees for First Amendment protected activity simply because the employee serves "at the pleasure of" a particular elected official. If such a state or local law did exist, its application to employees who do not otherwise

fall within the *Elrod-Branti* exception would run afoul of the First Amendment. *See Zold v. Twp. of Mantua*, 935 F.2d 633, 639 (3d Cir. 1991) ("There is no basis to assume that an employee hired at-will who can be fired for any reason or no reason can be fired for a constitutionally prohibited reason."); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[E]ven though a person has no 'right' to a valuable governmental benefit … [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.").

Defendants also argue that Plaintiff's complaint "admits that his actual responsibilities were policy-related and involved communication with the public." Mot. at 11 (citing Compl. ¶¶ 24, 36). To support this argument, Defendants first point to Plaintiff's allegation that "[a]s a part-time employee, Mr. Gomez's responsibilities included, but were not limited to, addressing concerns raised by constituents, and representing Mayor Fulop at events that he chose not to attend." Compl. ¶ 24. This allegation could touch on at least one aspect, and arguably two aspects, of the *Elrod-Branti* analysis: first, whether Plaintiff "participates in discussions or other meetings," and perhaps second, whether he "can speak in the name of policymakers." *See Galli*, 490 F.3d at 271 (citing *Brown v. Trench*, 787 F.2d 167, 169 (3d Cir. 1986)). But this allegation describes Plaintiff's responsibility in a *prior* part-time position with the Mayor's office that he left in 2019 before eventually returning in a full-time capacity. Compl. ¶ 27.

The second allegation Defendants point to as an admission of policymaking responsibility reads: "In 2022, Mayor Fulop appointed Mr. Gomez as a member of the Jersey City LGBTQ+ Task Force." Reliance on Plaintiff's Task Force membership is unavailing for at least two reasons: first, according to the Complaint, Plaintiff's membership on the Task Force—though seemingly resulting from his relationship with the Mayor—was *not* part of his job responsibilities as an aide to the Mayor. *See* Compl. ¶ 38 ("Mayor Fulop did not need to appoint a City of Jersey City employee to this role. His appointment power would have allowed him to appoint any person to the task force.").[5] And second, Defendants also do not identify which, if any, of the seven factors identified in *Brown* and repeated in *Galli* and *Minor* would be impacted by Plaintiff's membership on the LBTQ+ Task Force—the Complaint describes the Task Force as a relatively dormant entity, Compl. ¶ 42, and the facts alleged do not permit the Court to imagine what types of policymaking activity the Task Force might have undertaken.

It is entirely possible that "party affiliation is an appropriate requirement for the effective performance" of the office of aide to the mayor, but—taking Plaintiff's well-pleaded allegations as true and drawing all reasonable inferences in his favor—this factual question cannot be resolved before discovery.[6]

---

[5] Defendant Fulop implicitly acknowledged a distinction between Plaintiff's role as an aide and his membership on the LGBTQ+ Task Force when he "advised Mr. Gomez that he needed to resign from the LGBTQ+ task force and that when Mr. Gomez was home from vacation they, '[w]ill discuss whether you … can remain working in my office." Compl. 72.

[6] In a footnote, Defendants argue that Plaintiff's claim against Defendant Mobin Yousaf should be dismissed because "there are no factual allegations with respect to Yousaf's conduct in the Complaint, aside from sending a formal notice of his termination." Mot. at 8. On this score, Defendants are correct: the Complaint alleges only that "Defendant Yousaf, in a letter dated August 12, 2024, sent via regular and certified mail, notified Mr. Gomez of the termination

### 2. *Retaliation for Exercise of Right to Freedom of Speech*

Apart from their analysis of Plaintiff's freedom of association claim, Defendants argue that "[t]o the extent Plaintiff claims his termination was in 'retaliation' for his speech expressing support for his sister's candidacy, this claim too fails as a matter of law." Mot. 12. "To prevail on a § 1983 First Amendment retaliation claim, the plaintiff must prove that (1) he engaged in 'constitutionally protected conduct,' (2) the defendant engaged in 'retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights,' and (3) 'a causal link [existed] between the constitutionally protected conduct and the retaliatory action.'" *Palardy v. Twp. of Millburn*, 906 F.3d 76, 80 (3d Cir. 2018) (quoting *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)). The first of these considerations requires a legal determination, where the latter two are based in fact. *Baloga v. Pittson Area Sch. Dist.*, 927 F.3d 742, 752 n.7 (3d Cir. 2019).

#### i. Constitutionally Protected Conduct

"Insofar as workplace speech is concerned, the Supreme Court has long held that public employees only receive First Amendment protection from retaliation in the workplace when they speak out on a matter of public concern and their interest in speaking outweighs the government's interest in promoting workplace efficiency and avoiding disruption." *Palardy*, 906 F.3d at 81 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

"A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social or other concern to the community,'" *Green v. Philadelphia Hous. Auth.*, 105 F.3d 882, 885-86 (3d Cir. 1997) (quoting *Connick v. Myers*, 461 U.S. 138 (1983)); *see also Curinga v. City of Clairton*, 357 F.3d 305 (3d Cir. 2004) (quoting *Green*); *Fenico v. City of Philadelphia*, -- F. Supp. 3d --, 2024 WL 4591798, at *32 (E.D. Pa. Oct. 28, 2024) (differentiating matters of public concern from "purely private intraoffice grievance[s]."). Each of the instances of speech arguably at issue here can be fairly considered as relating to political, social, or other community concerns.

First, Plaintiff's donations to his sister's political campaign clearly constitute political speech. *Cf. Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010). Second, his statement given to the Jersey City Times ("While I support all of my family members, including my sister Valentina, in their personal endeavors, we often have different views. My life story and trajectory reflect my commitment to inclusivity, respect, and equality for all individuals. I do not share the views expressed in her statement," is, too, speech on a matter of public concern, because it responds to the political views expressed by his sister, a candidate for office. *See Farber v. City of Paterson*, 2006 WL 3485919 (D.N.J. Nov. 29, 2006) ("[I]t seems beyond dispute that contributions to political discourse are matters of public concern."). The same is true of his longer statement issued on August 5, 2024 in which, in addition to stepping down from the LGBTQ+ Task Force, he discussed the present state of political discourse and reaffirmed his support for the LGBTQ+ community. *See Curinga v. City of Clairton*, 357 F.3d 205, 313 n.6 (3d

---

of his employment with the City of Jersey City, effective retroactively to August 6, 2024." Compl. ¶ 99. Accordingly, the claim against Defendant Yousaf is **DISMISSED**.

Cir. 2004) (determining that plaintiff's letter which was comprised of "a mixture of personal and public matters" contained "sufficient content of public concern to warrant consideration under *Pickering*.").

The Court is also satisfied that each of these speech activities were undertaken in Plaintiff's personal capacity as a citizen, not in his role as a public employee. "Whether a person speaks as a citizen depends less on the subject matter—though that is relevant—than on the manner of speech, specifically whether the plaintiff is 'expected, pursuant to [his or her] job duties,' to make the speech that is at issue." *Jerri v. Harran*, 625 Fed. App'x 574, 580 (quoting *Foraker v. Chaffinch*, 501 F.3d 231, 241 (3d Cir.2007), *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011)). There is no convincing argument that Plaintiff was expected to engage in speech activity in support of his sister's political campaign pursuant to his official job responsibilities.

Defendants resist this conclusion by arguing that "Plaintiff published his [August 5] statement on social media as a public notice that he was 'formally stepping down from the Mayor's LGBTQ+ Task Force" and that "Mayor Fulop—Plaintiff's direct supervisor—instructed Plaintiff to issue the statement." Mot. 14. The flaw in Defendants' argument concerning the August 5 statement is that Plaintiff's claim is that he was fired, at least in part, for the speech that he *refused* to include in the statement, not the speech that he *did* include in his statement. *See* Compl. ¶ 97 (quoting Defendant Fulop as saying "I am gonna look in five minutes, if it is not clear where you stand then you are not with me, you're with her and you can't work with me, period. Okay, like that's it."). It is difficult to imagine how Defendant Fulop's instruction that Plaintiff publicly denounce his sister's campaign—in his own name, not on behalf of the office of the mayor—or else risk losing his job, could be an instruction to speak pursuant to properly assigned job responsibilities as a public employee.

Defendants' strongest argument for dismissal appears to be that the government's interest in promoting workplace efficiency and preventing disruption outweigh Plaintiff's speech interest. "This balancing test is a 'fact-intensive inquiry that requires consideration of the entire record, and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest.'" *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 104 (3d Cir. 2022) (citing *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015).[7] Defendants' arguments concerning the workplace disruption caused by Plaintiff's

---

[7] In *Janus v. American. Federation of State, County., and Municipal Employees, Council 31*, the Supreme Court declined to decide whether *Pickering* applies to compelled speech, but acknowledged that to the extent it does, "it would certainly require adjustment in that context." 585 U.S. 878, 908 (2018).

> [T]he *Pickering* framework fits much less well where the government compels speech or speech subsidies in support of third parties. *Pickering* is based on the insight that the speech of a public-sector employee may interfere with the effective operation of a government office. When a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf, the calculus is very different. Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message. Otherwise, however, it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree.

speech conduct are well taken, but at this stage the Court is not prepared to conclude as a matter of law that the alleged disruption justified Plaintiff's termination. The Court will await further factual development before making any such determination.

### ii. Retaliatory Action & Independent Justification

Defendants do not contest that they terminated plaintiff's employment, and the allegations in the Complaint leave no doubt that Plaintiff's support for, and refusal to denounce, his sister's political campaign were a substantial factor in his firing. *See* Compl. ¶¶ 97-98. With that established, the burden shifts to Defendants to demonstrate "that the same adverse action would have taken place in the absence of the protected conduct." *Moffitt v. Tunkhannock Area Sch. Dist.*, 160 F. Supp. 3d 786, 797 (M.D. Pa. 2016) (citing *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005), and *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009)).

Defendants argue that "Plaintiff's collaboration with his sister to surreptitiously record a conversation with Mayor Fulop and subsequently publish that recording on social media ... constituted a breach of professional trust between Mayor Fulop and Plaintiff" such that "Jersey City was [] well within its rights to terminate Plaintiff because ... Plaintiff was flagrantly insubordinate to Mayor Fulop." Mot. 17-18. First of all, the Opposition and Reply acknowledge that there remains a factual dispute as to whether Plaintiff himself was involved with, or aware of, the surreptitious recording of his phone call with Defendant Fulop, and the Court expects that that issue will be the subject of discovery. *See* Opp. 29, Reply 7 n.2. Moreover, even assuming that Plaintiff was involved in the recording, its content suggests that the decision to terminate Plaintiff was already made by the time the recording was shared: the recording allegedly includes an express threat by Defendant Fulop that he was "going to fire" Plaintiff if he did not make a public statement to Defendant Fulop's satisfaction. And further, both Defendant Fulop's statement that "as of tomorrow [Plaintiff] no longer works [for the City] bc he doesn't reflect the values of the city," Compl. ¶ 98, and his spokesperson's statement that "[w]hether it's campaigning for his sister, advising her hate-driven campaign, or supporting her financially, the fact is that Jonathan's actions render his responsibilities working in City Hall on policies around diversity impossible to achieve," Compl. ¶ 111, both suggest that Plaintiff's speech and/or association conduct were the basis for his firing.

### 3. Qualified Immunity

Finally, the individual defendants are not entitled to qualified immunity on Plaintiff's First Amendment claims. "To resolve a claim of qualified immunity, [the Court] engage[s] in a two-pronged inquiry: (1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was clearly established at the time of the official's conduct." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (cleaned up). As already discussed, Plaintiff has sufficiently alleged the violation of his constitutional rights to freedom of association and freedom of speech. Specifically, Plaintiff has alleged that he was fired from a position of public employment for which political affiliation was not a proper consideration based on his associational activity,

---

*Id.* (citation omitted). As this issue has not been briefed, this Court declines to decide whether and how *Pickering* applies in this setting.

and that he was fired from his position of public employment in retaliation for his protected speech conduct.

Both of these rights were clearly established at the time of Plaintiff's firing, and if Plaintiff is able to prove all elements of these claims—including that his was the type of job for which political affiliation was not a proper employment consideration—then Defendants will not be entitled to qualified immunity. *See Minor*, 70 F.4th at 176 (noting that "[a]lthough ... mindful of [the] obligation not to 'define clearly established law at a high level of generality,' [the Court] cannot ignore the dictates of [Third Circuit] precedent" in determining that plaintiff had clearly established right not to be terminated from job without policymaking responsibility on account of political affiliation); *Burns v. County of Cambria, Pa.*, 971 F.2d 1015, 1024 (3d Cir. 1992) (recognizing that court had "already observed that it was 'clearly established' by 1982" that "public employees could not be fired for their political affiliation"); *Bennis v. Gable*, 823 F.2d 723, 733 (3d Cir. 1987) ("[W]e cannot, in good conscience, conclude that in 1982 a reasonably active politician would not have believed that it would be impermissible to demote an employee in retaliation for his political speech and/or associations.").

Defendants' motion to dismiss Counts One and Two of Plaintiff's complaint is **DENIED**.

### B. NJLAD Claims (Counts Three and Four)

Defendants next move to dismiss Plaintiff's NJLAD discrimination claims. Plaintiff alleges that the "City of Jersey City terminated plaintiff because of his race, color, national origin, and/or ancestry," Compl. ¶ 141, that the "City of Jersey City discriminated against plaintiff because of his race, color, national origin, and/or ancestry," Compl. ¶ 142, and that "Mayor Fulop, John Metro and John Minella knowingly and substantially assisted in violation of NJLAD," Compl. ¶ 151. In effect, Plaintiff brings both hostile work environment and discriminatory discharge claims against the City of Jersey City—both of which are premised on alleged discrimination based on his heritage as a Colombian immigrant—and alleges that Defendants Fulop, Metro, and Minella aided and abetted the City in its violation.

To state a claim for discriminatory discharge under the NJLAD, a plaintiff must first demonstrate "(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job." *Kirschling v. Atlantic City Bd. of Educ.*, 10 F. Supp. 3d 587, 593 (D.N.J. 2014). Plaintiff conceded in his brief opposing dismissal that "[u]pon information and belief, defendants have not sought to replace Mr. Gomez as no aide to defendant Fulop has been appointed." Opp. 37. Accordingly, Plaintiff's discriminatory discharge claim fails.[8]

To succeed on a hostile work environment claim under the NJLAD, Plaintiff must demonstrate that "the defendant's conduct (1) would not have occurred but for the employee's [national origin]; and the conduct was (2) severe or pervasive enough to make a (3) reasonable

---

[8] Plaintiff's discriminatory discharge claim is further undermined by its inconsistency with his own allegation that he was fired not for his national origin, but "for [his] political support of Ms. Gomez's political campaign[.]" Compl. ¶ 104.

[Colombian immigrant] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Taylor v. Metzger*, 152 N.J. 490 (1998)). "In evaluating a hostile work environment claim under both [federal law] and the [NJLAD, courts] are mindful that 'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). This analysis includes assessment of the frequency, severity, and content of the alleged discriminatory conduct, as well as whether it "unreasonably interfere[d] with the employee's job performance." *Godfrey v. Princeton Theological Seminary*, 196 N.J. 178, 196 (2008).

Plaintiff's allegations in support of his claim for discrimination based on national origin are limited to (1) Defendant Minella asking "[i]s this how all Colombians behave?" in response to Ms. Gomez's campaign videos, Compl. ¶ 108; (2) Defendant Minella "question[ing] if all Colombians were loud," *id.*; and (3) Defendant Minella making "culturally insensitive remarks about his food choices" which "occasionally consisted of rice and beans," Compl. ¶ 109. None of these allegations, taken as true, rises to the level of unlawful workplace discrimination. While perhaps insensitive, Defendant Minella's comments are not "so egregious that it alters the conditions of employment[.]" *Rich v. State*, 294 F. Supp. 3d 266, 281 (D.N.J. 2018). Counts Three and Four are **DISMISSED**.

### C. Defamation and False Light Claims (Counts Five and Six)

Defendants seek to dismiss Plaintiff's tort claims for failure to comply with the procedural strictures of New Jersey's Tort Claims Act ("TCA"). Under the TCA, to bring a tort suit against public entities or employees under state law, plaintiffs must first file a timely "notice of claim." *See* N.J.S.A. §§ 59:8-8, 8-9; *Velez v. City of Jersey City*, 850 A.2d 1238, 1243 (N.J. 2004). If the plaintiff fails to do so, he is generally "forever barred from recover[y]." N.J.S.A. §§ 59:8-8. In some circumstances, the Court may permit a plaintiff to file a late notice of claim, but only "if doing so would not cause substantial prejudice to the defendant and if the untimeliness was due to 'extraordinary circumstances.'" *Herman v. S. Orange-Maplewood Sch. Dist. Bd. of Educ.*, 2023 WL 2540428, *7 (D.N.J. Mar. 15, 2023) (citing N.J.S.A. § 59:8-9).

Under the terms of the TCA, Plaintiff's notice of claim should have been submitted to the City of Jersey City no later than November 4, 2024. But he did not file a notice of claim until March 3, 2025—*after* Defendants filed their motion to dismiss. Plaintiff argues that he substantially complied with the statute by filing an "EEO complaint" on August 5, 2024. But assuming *arguendo* that such a complaint was filed on August 5, 2024, it could not have encompassed the tort claims at issue here because that complaint would have been submitted the day *before* the allegedly defamatory statement was made. Moreover, Plaintiff has identified no "extraordinary circumstances" underlying his failure to abide the pre-suit notice requirement.[9]

---

[9] Even if the Court were inclined to credit Plaintiff's substantial compliance argument and allow his tort claims to proceed, and further accepting *arguendo* Plaintiff's characterization of Defendants' statements as "paint[ing] Mr. Gomez as a bigot and racist," Compl. at ¶ 112, they would still fail as a matter of law because a generalized accusation of racism or bigotry is not sufficiently factual—that is, subject to proof or disproof—to support a claim for either defamation or false light. "In New Jersey, a generalized accusation of bigotry is not actionable." *Bender v. Smith Barney, Harris Upham & Co., Inc.*, 901 F. Supp. 863, 871 (D.N.J. 1994); *see also Edelman v. Croonquist*, 2010 WL 1816180, *6 (D.N.J. May 4, 2010) ("The defendant's characterization of her in-laws as racists is a subjective assertion,

Nor does Plaintiff prevail on his argument that the pre-suit notice requirement is inapplicable to claims involving actual malice under N.J.S.A. § 59:3-14. *See* Opp. at 32. "As both the New Jersey Supreme Court and courts of this district have recognized, failure to provide notice under the [TCA] waives a claim, even if the officer would not be entitled to immunity otherwise." *Panarello v. City of Vineland*, 160 F. Supp. 3d 734, 745 (D.N.J. 2016). This is because the conditional waiver of immunity from suit embodied in N.J.S.A. § 59:3-14 "must be read together with the overall mandate of N.J.S.A. § 59:8-3, that '[n]o action shall be brought against a public entity or public employee under this [A]ct unless the claim [is] … presented in accordance with the procedure set forth in this [Act].'" *Velez v. City of Jersey City*, 180 N.J. 284, 294 (2004). Put simply, N.J.S.A. § 59:3-14 "does not limit the necessity of notice." *Id.*

Counts Five and Six are **DISMISSED**.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. An appropriate order follows.

Date: April __14__, 2025

WILLIAM J. MARTINI, U.S.D.J.

---

not sufficiently susceptible to being proved true or false to constitute defamation."); *Romaine v. Kallinger*, 109 N.J. 282, 294 ("[A] fundamental requirement of the false light tort is that the disputed publicity be in fact false, or else at least have the capacity to give rise to a false public impression as to the plaintiff.").